UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 02136

-----------------------------------------------------------X

GOVERNING DYNAMICS
INVESTMENTS, LLC,

                  Plaintiff,

-against-

SYNOVICS PHARMACEUTICALS, INC.,
f/k/a BIONUTRICS, INC.,

                  Defendant.

-----------------------------------------------------------X

Index No.
Date Filed:
COMPLAINT

MAR 0 3 2008
U.S.D.C. S.D N.Y.
CASHIERS

Plaintiff, GOVERNING DYNAMICS INVESTMENT, LLC ("Plaintiff"), by and through its attorneys, as and for its Complaint ("Complaint"), respectfully alleges as follows:

## NATURE OF THIS ACTION

1.      This is an action to recover sums due pursuant to a Convertible Promissory Note dated February 19, 2006 (the "Note"), in which defendant, SYNOVICS PHARMACEUTICALS, INC., formerly known as BIONUTRICS, INC. (the "Defendant"), promised to pay to plaintiff, GOVERNING DYNAMICS INVESTMENT LLC (the "Plaintiff"), the principal sum of One Hundred Thousand Dollars ($100,000.00), with interest as specified therein.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

3.    Venue in the Southern District of New York is proper pursuant to 28

U.S.C. §1391(a)(2), because a substantial portion of the events or omissions giving rise

to the claim occurred within such district, and Defendant expressly consented to venue

in this District pursuant to paragraph 21 of the Note.

4.    Paragraph 21 of the Note provides in relevant part:

> Any legal action or proceeding with respect to this
> Convertible Note may be brought in the courts of the State of
> New York or of the United States of America sitting in New
> York County, and, by execution and delivery of this
> Convertible Note, the [Defendant] hereby accepts for itself
> and in respect of its property, generally and unconditionally,
> the jurisdiction of the aforesaid courts.

5.    Thus, Defendant has consented to personal jurisdiction in this Court, this

Court has subject matter jurisdiction, and venue in this district is proper.

## PARTIES

6.    Plaintiff is a limited liability company organized and existing under the laws

of Delaware, with its principal place of business located at 134 West 37th Street, 2nd

Floor, New York, NY 10018.

7.    Upon information and belief and at all times mentioned herein, Defendant

was and is a corporation organized and existing under the laws of the State of Nevada,

with its principal place of business located at 5360 Northwest 35th Avenue, Ft.

Lauderdale, FL 33309.

8.    Upon information and belief, Defendant was incorporated under the name

Bionutrics Inc., and, on April 11, 2006, changed its name to its current name, Synovics

Pharmaceuticals, Inc.

## THE NOTE

9.     On or about February 10, 2006, Plaintiff, at the request of Defendant, loaned Defendant the principal sum of One Hundred Thousand Dollars ($100,000.00) (the "Loan").

10.     In connection with the Loan, Defendant executed in favor of and delivered to Plaintiff the Note, a copy of which is annexed as Exhibit A hereto.

11.     The Note is in the principal amount of One Hundred Thousand Dollars ($100,000.00).

12.     The Note provides for interest in quarterly installments in arrears, beginning on April 1, 2006.  Interest under the Note was at the rate of nine percent (9%) per annum, provided Defendant was not in default of its obligations under the Note.

13.     Barring a default, the full outstanding principal amount and accrued interest was due on the eighteen month anniversary of the issuance date of the Note, or August 19, 2007 (the "Maturity Date").

14.     Defendant defaulted in its obligation to pay to Plaintiff any of the quarterly interest payments due to Plaintiff under the Note, except for a single $2,520  installment paid in or about July, 2006.

15.     By notice dated September 12, 2007, a copy of which is annexed as Exhibit B hereto, Plaintiff declared Defendant in default by reason of its failure to pay the required quarterly interest payments due under the Note, and demanded immediate payment of the full outstanding principal amount and accumulated interest, all as authorized under Paragraph 8 of the Note.

16.    Defendant is in default of its obligations under the Note in that it has failed and omitted to pay to Plaintiff any of the quarterly interest payments due to Plaintiff under the Note, except as set forth above, and has also failed to pay to Plaintiff the full outstanding principal amount and accumulated interest due to it pursuant to the September 12, 2007 notice of default.

17.    Defendant is in further default of its obligations under the Note in that it has failed and omitted to pay to Plaintiff the full outstanding principal amount and accrued interest, which, even in the absence of Defendant's prior default, became due and payable on the Maturity Date.

## AS AND FOR A FIRST CAUSE OF ACTION

**(Breach of Agreement to Repay Amounts
Owed Pursuant to Promissory Note)**

18.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 17 above as if fully set forth herein.

19.    The Note provides that if an event of default under the Note has occurred and is continuing, interest shall accrue at the rate of eighteen percent (18%) per annum retroactive to the date of the Note on the unpaid amount of the Note outstanding from time to time through the date on which the event of default ceases to exist.

20.    Pursuant to Paragraph 10 of the Note, Defendant must pay to Plaintiff all of the fees and expenses, including reasonable attorneys' fees and expenses, incurred by Plaintiff in the enforcement of the Note.

21.    Plaintiff has complied with all of its obligations, if any, under the Note.

22.    Defendant is liable to for the full outstanding principal amount of $100,000 due under the Note, together with interest at the rate of eighteen percent (18%) per

annum from February 19, 2006, and attorneys' fees and expenses in an amount to be determined by the Court.

WHEREFORE, Plaintiff demands judgment as follows:

a.   On the first cause of action, in favor of Plaintiff and against Defendant, in an amount to be determined at trial, but in no event less than $100,000, plus interest at the rate of eighteen percent (18%) per annum from February 19, 2006 to the date of judgment, and Plaintiff's reasonable attorneys' fees and expenses;

b.   Costs, disbursements and such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        February 29, 2008

                                        EATON & VAN WINKLE LLP

                                        By: _____
                                             Brendan R. Marx (BRM-3007)

                                        Attorneys for Plaintiff, Governing
                                        Dynamics Investment, LLC

                                        3 Park Avenue
                                        New York, New York 10016
                                        Tel. No. (212) 779-9910

**Exhibit A**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THAT ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.**

**BIONUTRICS, INC.**
**DUPLICATE ORIGINAL**
**CONVERTIBLE PROMISSORY NOTE**

$100,000                                             Dated: February 19, 2006
(Original Principal Amount)                          (the "Issuance Date")

FOR VALUE RECEIVED BIONUTRICS, INC., a Nevada corporation (the "Company"), hereby promises to pay to GOVERNING DYNAMICS INVESTMENT LLC (the "Payee"), or its registered assigns, the principal amount of ONE HUNDRED THOUSAND DOLLARS ($100,000) together with interest thereon calculated from the date hereof in accordance with the provisions of this Convertible Promissory Note (as amended, modified and supplemented from time to time, this "Convertible Note" or upon transfer or exchange, the "Convertible Notes").

Certain capitalized terms are defined in Section 9 hereof.

1.      Payment of Interest.  Interest shall accrue at a rate equal to nine percent (9%) per annum (the "Interest Rate") beginning on the date of this Convertible Note on the unpaid principal amount of this Convertible Note outstanding from time to time; provided that so long as any Event of Default has occurred and is continuing, interest shall be deemed to accrue, to the extent permitted by law, at the rate of 18% per annum retroactive to the date of this Convertible Note on the unpaid principal amount of this Convertible Note outstanding from time to time through the date on which such Event of Default ceases to exist.  Interest shall be computed on the basis of the actual number of days elapsed and a 360-day year.  Interest on this Convertible Note shall be payable quarterly in arrears beginning on April 1, 2006.

2.      Maturity Date.  The entire principal amount of this Convertible Note and all accrued but unpaid interest thereon shall be due and payable in full in cash in immediately available funds on the eighteen (18) month anniversary of the Issuance Date (the "Maturity Date"), provided that, in the event that the Company consummates a Qualified Equity Financing (as defined in Section 9 below) prior to the eighteen (18) month anniversary of the Issuance Date, the Maturity Date of this Note shall be extended to the third anniversary of the Issuance Date.  Any overdue principal and overdue interest together with any interest thereon shall be due and payable upon demand.

3.      Conversion.  (i) The Payee shall have the option to convert this Convertible Note into common stock of the Company at any time at a conversion price equal to the lesser of (i) $3.00 per share or (ii) 75% of the then current conversion price per common share of the Company's Series A Preferred Stock (as defined in Section 9 below) (the "Conversion Price").  The optional conversion of this Convertible Note shall be deemed to have



been effected as of the close of business on the date on which this Convertible Note has been surrendered for conversion at the principal office of the Company. At the time such conversion has been effected, the rights of the holder of this Convertible Note as the holder of such note shall cease (with respect to the amount so converted), and the Person or Persons in whose name or names any certificate or certificates for shares of the Company common stock are to be issued upon such conversion shall be deemed to have become the holder or holders of record of the shares of such Company common stock (such common stock, the "Conversion Shares") represented thereby.

(ii)    If at any time prior to the earlier of (x) the date of the optional conversion of this Convertible Note into shares of Company common stock or (y) the Maturity Date, (i) the Company consummates a Qualified Equity Financing and (ii) the Company common stock trades at a 30 day trailing average closing price equal to 300% of the then applicable Conversion Price per share and the average Common Stock share volume during such 30 day trailing period equals or exceeds 40,000 shares per day, this Convertible Note shall automatically and without any further action by any Person convert into Company common stock at the then applicable Conversion Price, provided that, this mandatory conversion right will only be applicable to the holder of this Convertible Note if the Company common stock into which this Convertible Note is convertible is subject to an effective registration statement relating to the resale of such common stock at the time of such mandatory conversion.

(iii)    As soon as possible after any conversion of this Convertible Note has been effected (but in any event within three (3) Business Days following such conversion (the "Certificate Delivery Date")), the Company shall deliver to the converting holder an original certificate or certificates representing the number of shares of Company common stock issuable by reason of such conversion in such name or names and such denomination or denominations as the converting holder has specified.

(iv)    The issuance of certificates for shares of Company common stock upon conversion of this Convertible Note shall be made without charge to the holder hereof for any issuance tax in respect thereof or other cost incurred by the Company in connection with such conversion and the related issuance of shares of Company common stock. Upon conversion of this Convertible Note, the Company shall take all such actions as are necessary in order to insure that the Company common stock issuable with respect to such conversion shall be validly issued, fully paid and nonassessable.

(v)    Except as required by applicable law, the Company shall not close its books against the transfer of Company common stock issued or issuable upon conversion of this Convertible Note in any manner which interferes with the timely conversion of this Convertible Note. The Company shall assist and cooperate with any holder of this Convertible Note required to make any governmental filings or obtain any governmental approval prior to or in connection with the conversion of this Convertible Note (including, without limitation, making any filings required to be made by the Company).

(vi)    The Company shall at all times reserve and keep available out of its authorized but unissued shares of Company common stock, solely for the purpose of issuance upon

2



conversion hereunder, such number of shares of Company common stock issuable upon conversion. All shares of such capital stock which are so issuable shall, when issued, be duly and validly issued, fully paid and nonassessable and free from all taxes, liens and charges (except for any such liens created by the Holder). The Company shall take all such actions as may be necessary to assure that all such shares of capital stock may be so issued without violation of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which such shares of capital stock.

4.     Adjustments of Conversion Price and Number of Conversion Shares. The number of and kind of securities purchasable upon conversion of this Note for shares of the Company's common stock shall be subject to adjustment from time to time as set forth in this Section 4.

(a)     Subdivisions, Combinations, Stock Dividends, Sales and other Issuances. If at any time after the date hereof, the Company shall issue shares of Common Stock or rights, options, warrants or other securities to subscribe for or purchase Common Stock, or securities convertible or exercisable into or exchangeable for Common Stock ("Common Stock Equivalents") (excluding shares, rights, options, warrants, or convertible or exchangeable securities, issued or issuable (i) upon exercise of the Warrants or any other Common Stock Equivalents outstanding as of the date hereof, or issuable in connection with the Company's Series A Preferred Stock offering, (ii) upon conversion of the Series A Preferred Stock, par value $0.01 per share, of the Company, (iii) pursuant to the exercise of any stock options or warrants currently outstanding or options or warrants issued after the date hereof pursuant to any Company benefit plan, stock option plan, stock bonus plan or other equity program approved by the Company's Board of Directors, but only to the extent, that such shares of Common Stock issued or issuable pursuant to such stock option plans, stock bonus plans or stock incentive plans does not exceed ten percent (10%) of the then outstanding Common Stock on a fully diluted basis, or (i) with respect to any issuance or transaction as to which holders of a 66-2/3% of the then outstanding shares of the Company's Series A Preferred Stock, have provided prior written consent), at a price per share lower than the Conversion Price per share of Common Stock in effect immediately prior to such issuance, then the Conversion Price shall be reduced on the date of such issuance to a price (calculated to the nearest cent) determined by multiplying the Conversion Price in effect immediately prior to such issuance by a fraction, (1) the numerator of which shall be an amount equal to the sum of (A) the number of shares of Common Stock on a fully diluted basis (assuming conversion, exchange or exercise of all Common Stock Equivalents) immediately prior to such issuance plus (B) the quotient obtained by dividing the consideration received by the Company upon such issuance by the Conversion Price, and (2) the denominator of which shall be the total number of shares of Common Stock on a fully diluted basis (assuming conversion, exchange or exercise of all Common Stock Equivalents) immediately after such issuance. For the purposes of such adjustments, the maximum number of shares which the holders of any such Common Stock Equivalents shall be entitled to subscribe for or purchase or convert or exchange such securities into shall be deemed to be issued and outstanding as of the date of such issuance (whether or not such Common Stock Equivalent is then exercisable, convertible or exchangeable), and the consideration received by the Company therefor shall be deemed to be the consideration received by



the Company for such Common Stock Equivalents, plus the minimum aggregate consideration or premiums stated in such Common Stock Equivalents, to be paid for the shares covered thereby. No further adjustment of the Conversion Price shall be made as a result of the actual issuance of shares of Common Stock on exercise of such Common Stock Equivalents. On the expiration or the termination of such Common Stock Equivalents, or the termination of such right to convert or exchange, the Conversion Price shall forthwith be readjusted (but only with respect to that portion of the Notes which has not yet been exercised) to such Conversion Price as would have obtained had the adjustments made upon the issuance of such Common Stock Equivalents, been made upon the basis of the delivery of only the number of shares of Common Stock actually delivered upon the exercise of such Common Stock Equivalents; and on any change of the number of shares of Common Stock deliverable upon the exercise of any such Common Stock Equivalents, or any change in the consideration to be received by the Company upon such exercise, conversion, or exchange, including, but not limited to, a change resulting from the anti-dilution provisions thereof, the Conversion Price, as then in effect, shall forthwith be readjusted (but only with respect to that portion of the Note which has not yet been converted after such change) to such Conversion Price as would have been obtained had an adjustment been made upon the issuance of such Common Stock Equivalents not exercised prior to such change, or securities not converted or exchanged prior to such change, on the basis of such change.

(b)    Merger, etc.  If at any time after the date hereof there shall be a merger or consolidation of the Company with or into or a transfer of all or substantially all of the assets of the Company to another entity, then the Holder shall be entitled to receive upon or after such transfer, merger or consolidation becoming effective, and upon payment of the Conversion Price then in effect, the number of shares or other securities or property of the Company or of the successor corporation resulting from such merger or consolidation, which would have been received by the Holder for the shares of stock subject to this Note had this Note been converted just prior to such transfer, merger or consolidation becoming effective or to the applicable record date thereof, as the case may be. The Company will not merge or consolidate with or into any other corporation, or sell or otherwise transfer its property, assets and business substantially as an entirety to another corporation, unless the corporation resulting from such merger or consolidation (if not the Company), or such transferee corporation, as the case may be, shall expressly assume in writing the due and punctual performance and observance of each and every covenant and condition of this Note to be performed and observed by the Company.

(c)    Reclassification, etc.  If at any time after the date hereof there shall be a reorganization or reclassification of the securities as to which conversion rights under this Note exist into the same or a different number of securities of any other class or classes, then the Holder shall thereafter be entitled to receive upon conversion of this Note, during the period specified herein and upon payment of the Conversion Price then in effect, the number of shares or other securities or property resulting from such reorganization or reclassification, which would have been received by the Holder for the shares of stock subject to this Note had this Note at such time been exercised.

4



(d)    For the purposes of the foregoing adjustments, in the case of the issuance of any convertible securities (including, without limitation, shares of Series A Preferred Stock) warrants, options or other rights to subscribe for or to purchase or exchange for, shares of Common Stock ("Convertible Securities"), the maximum number of shares of Common Stock issuable upon exercise, exchange or conversion of such Convertible Securities shall be deemed to be outstanding, provided that no further adjustment shall be made upon the actual issuance of Common Stock upon exercise, exchange or conversion of such Convertible Securities. Upon the expiration of any such Convertible Securities or the termination of any such right to convert or exchange such Convertible Securities, the Exercise Price then in effect hereunder shall forthwith be increased to the Exercise Price which would have been in effect at the time of such expiration or termination had such Convertible Securities, to the extent outstanding immediately prior to such expiration or termination, never been issued, and the Common Stock issuable thereunder shall no longer be deemed to be outstanding.

(e)    In the event of any adjustment in the number of Conversion Shares issuable hereunder upon conversion, the Exercise Price shall be inversely proportionately increased or decreased as the case may be, such that aggregate purchase price for Conversion Shares upon full conversion of this Note shall remain the same. Similarly, in the event of any adjustment in the Conversion Price, the number of Conversion Shares issuable hereunder upon conversion shall be inversely proportionately increased or decreased as the case may be, such that aggregate purchase price for Conversion Shares upon full conversion of this Note shall remain the same.

5.    <u>Method of Payments.</u>

(i)    <u>Payment.</u>  So long as the Payee or any of its nominees shall be the holder of any Convertible Note, and notwithstanding anything contained elsewhere in this Convertible Note to the contrary, the Company will pay all sums for principal, interest, premiums, dividends or otherwise becoming due on this Convertible Note held by the Payee or such nominee not later than 5:00 p.m. New York time, on the date such payment is due, in immediately available funds, in accordance with the payment instructions that the Payee may designate in writing, without the presentation or surrender of such Convertible Note or the making of any notation thereon. Any payment made after 5:00 p.m. New York time, on a Business Day will be deemed made on the next following Business Day. If the due date of any payment in respect of this Note would otherwise fall on a day that is not a Business Day, such due date shall be extended to the next succeeding Business Day, and interest shall be payable on any principal so extended for the period of such extension. All amounts payable under this Convertible Note shall be paid free and clear of, and without reduction by reason of, any deduction, set-off or counterclaim. The Company will afford the benefits of this Section to the Payee and to each other Person holding this Convertible Note.

(ii)    <u>Transfer and Exchange.</u>  Subject to applicable law, upon surrender of any Convertible Note for registration of transfer or for exchange to the Company at its principal office, the Company at its sole expense will execute and deliver in exchange therefore a new Convertible Note or Convertible Notes, as the case may be, as requested by the holder or

5



transferee, which aggregate the unpaid principal amount of such Convertible Note, registered as such holder or transferee may request, dated so that there will be no loss of interest on the Convertible Note and otherwise of like tenor; provided that this Convertible Note may not be transferred by Payee to any Person other than Payee's affiliates without the prior written consent of the Company (which consent shall not be unreasonably withheld or delayed). The issuance of new Convertible Notes shall be made without charge to the holder(s) of the surrendered Convertible Note for any issuance tax in respect thereof or other cost incurred by the Company in connection with such issuance, provided that each Convertible Noteholder shall pay any transfer taxes associated therewith. The Company shall be entitled to regard the registered holder of this Convertible Note as the holder of the Convertible Note so registered for all purposes until the Company or its agent, as applicable, is required to record a transfer of this Convertible Note on its register.

      (iii)  <u>Replacement</u>. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any Convertible Note and, in the case of any such loss, theft or destruction of any Convertible Note, upon receipt of an indemnity reasonably satisfactory to the Company or, in the case of any such mutilation, upon the surrender and cancellation of such Convertible Note, the Company, at its expense, will execute and deliver, in lieu thereof, a new Convertible Note of like tenor and dated the date of such lost, stolen, destroyed or mutilated Convertible Note.

      6.  <u>Representations and Warranties of the Company</u>. The Company represents and warrants to Payee that:

      (i)  <u>Organization and Qualification</u>. The Company and each of its subsidiaries is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, with power and authority to conduct its business as it is now being conducted, to own or use its properties and assets that it purports to own or use and, in the case of the Company, to perform its obligations under this Convertible Note. The Company and each of its subsidiaries is duly qualified to do business as a foreign company and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

      (ii)  <u>Absence of Conflicts</u>. Neither the execution, delivery and performance of this Convertible Note by Company, nor the consummation of the transactions contemplated hereby, nor compliance by Company with any of the provisions hereof, will (a) violate, conflict with, or result in a breach of any provision of, constitute a default under, or permit or result in the termination of, acceleration of any obligation under, or creation of a lien under any of the terms, conditions or provisions of, (i) the certificate of incorporation, bylaws or stockholders agreements of Company, or (ii) any note, mortgage, agreement, indenture, or license by which Company or any of its properties or assets may be bound, or to which Company or any of its properties or assets may be subject, or (b) violate or conflict with any law, rule, regulation, judgment, ruling, order, writ, injunction or decree applicable to Company or any of its properties or assets.

6



(iii)    <u>Authorization of Agreements, Etc.</u>  Each of (i) the execution and delivery by the Company of this Convertible Note, (ii) the performance by the Company of its obligations hereunder, and (iii) the issuance, sale and delivery by the Company of this Convertible Note has been duly authorized by corporate action of the Company.

(iv)    <u>Validity.</u>  This Convertible Note has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors rights generally or by equitable principles relating to enforceability.

(v)    <u>Capitalization.</u>  After giving effect to the transactions contemplated by this Convertible Note, the reservation of 1,900,000 shares of Common Stock for employees of the Company, and the issuance of warrants to certain Convertible Noteholders, the capitalization of the Company shall be as reflected in the capitalization table attached hereto as <u>Schedule A</u>.

(vi)    <u>Securities Act.</u>  Assuming the accuracy of the representations of Convertible Noteholders set forth in Section 5 hereof, neither the registration of any security under the Securities Act of 1933, as amended, or the securities laws of any state, nor the qualification of an indenture in respect thereof under the Trust Indenture Act of 1939, as amended, is required in connection with the issuance, execution and delivery of the Convertible Notes in the manner contemplated hereunder.

7.    <u>Covenants of the Company.</u>  The Company covenants and agrees as follows:

(i)    <u>Consolidation, Merger and Sale.</u>  The Company will not (i) consolidate or merge with or into (or permit any subsidiary to consolidate or merge with or into) any other person, or (ii) sell or otherwise dispose of (or permit any subsidiary to sell or otherwise dispose of) a material portion of its property or assets in one or more transactions to, any other person or entity or enter into (or permit any subsidiary to enter into) an agreement with respect to any of the foregoing.

(ii)    <u>Restricted Payments.</u>  The Company will not, and will not permit any of its subsidiaries to:  (i) declare or pay any dividends on, or make any other distribution or payment on account of, or redeem, retire, purchase or otherwise acquire, directly or indirectly, any equity interests of any class of the Company or any subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash, property or in obligations of the Company or any of its subsidiaries, (ii) other than in respect to accounts payable in the ordinary course of business, make any payments of principal of, or interest on, or retire, redeem, purchase or otherwise acquire any indebtedness other than this Convertible Note and the other Convertible Notes or (iii) enter into a loan agreement of any kind without receiving the prior written consent of Convertible Noteholders representing a majority of the aggregate principal amount of all Convertible Notes then outstanding.



(iii)    <u>Notice of Qualified Equity Financing</u>.  At least three (3) days prior to the closing of any Qualified Equity Financing, the Company shall provide Payee with written notice of such projected closing date, specifying the terms of the transaction and the proposed price per share of Series A Preferred Stock to be paid in such Qualified Equity Financing.  The Company shall promptly provide telephonic notice to Payee of any adjournments or rescheduling of such projected closing date.

(iv)    <u>Convertible Notes</u>.    All Convertible Notes shall be on the same terms and shall be in substantially the same form.  All payments to the holder of any Convertible Note shall be made to all holders of Convertible Notes, pro rata, based on the aggregate principal amount plus accrued but unpaid interest outstanding on such Convertible Notes at such time.

(v)    <u>Senior Status; No Assignment</u>.  Beginning on the Issuance Date and for so long as any Convertible Notes remain outstanding, the Company shall not, without the prior written consent of noteholders holding a majority of the aggregate outstanding principal amount of the Convertible Notes: (a) incur or otherwise become liable with respect to any indebtedness that would rank senior or *pari passu* to the Convertible Notes in order of payment, or (b) make any distribution, transfer, assignment or other disposition of the Company's operating assets (or any interest therein) or encumber of any assets of the Company in any manner.

8.    <u>Events of Default</u>.  If any of the following events takes place before the Maturity Date (each, an "<u>Event of Default</u>"), Payee at its option may declare all principal and accrued and unpaid interest thereon and all other amounts payable under this Convertible Note immediately due and payable; <u>provided</u>, <u>however</u>, that this Convertible Note shall automatically become due and payable without any declaration in the case of an Event of Default specified in clause (iii) or (v), below:

(i)    Company fails to make payment of the full amount due under this Convertible Note on a demand following the Maturity Date; or

(ii)    A receiver, liquidator or trustee of Company or any substantial part of Company's assets or properties is appointed by a court order; or

(iii)    Company is adjudicated bankrupt or insolvent; or

(iv)    Any of Company's property is sequestered by or in consequence of a court order and such order remains in effect for more than 30 days; or

(v)    Company files a petition in voluntary bankruptcy or requests reorganization under any provision of any bankruptcy, reorganization or insolvency law or consents to the filing of any petition against it under such law; or



(vi) Any petition against Company is filed under bankruptcy, receivership or insolvency law and such petition is not withdrawn within 60 days following the filing thereof; or

(vii) Company makes a formal or informal general assignment for the benefit of its creditors, or admits in writing its inability to pay debts generally when they become due, or consents to the appointment of a receiver or liquidator of Company or of all or any part of its property; or

(viii) An attachment or execution is levied against any substantial part of Company's assets that is not released within 30 days; or

(ix) Company dissolves, liquidates or ceases business activity, or transfers any major portion of its assets other than in the ordinary course of business; or

(x) Company breaches any covenant or agreement on its part contained in this Convertible Note or the Subscription Agreement; or

(xi) Any material inaccuracy or untruthfulness of any representation or warranty of the Company set forth in this Convertible Note or the Subscription Agreement.

9.    Definitions.

"Business Day" means a day (other than a Saturday or Sunday) on which banks generally are open in New York, New York for the conduct of substantially all of their activities.

"Convertible Noteholder" with respect to any Convertible Note, means at any time each Person then the record owner hereof and "Convertible Noteholders" means all of such Convertible Noteholders collectively.

"Equity Financing" means the issuance of stock of the Company to one or more investors for cash following the date of issuance of this Convertible Note.

"Person" means any person or entity of any nature whatsoever, specifically including, without limitation, an individual, a firm, a company, a corporation, a partnership, a limited liability company, a trust or other entity.

"Qualified Equity Financing" shall mean an Equity Financing resulting in cash proceeds to the Company of not less than $3.0 million (including the principal amount of the Convertible Notes) substantially on the terms set forth in the term sheet attached hereto as Exhibit A.



"Series A Preferred Stock" means the preferred stock of the Company issuable in a Qualified Equity Financing.

10.    Expenses of Enforcement, etc.  The Company agrees to pay all fees and expenses incurred by the Payee in connection with the negotiation, execution and delivery of this Convertible Note (including the reasonable fees of counsel to the placement agent for the Payees).  The Company agrees to pay all reasonable fees and expenses incurred by the Payee in connection with any amendments, modifications, waivers, extensions, renewals, renegotiations or "workouts" of the provisions hereof or incurred by the Payee in connection with the enforcement or protection of its rights in connection with this Convertible Note, or in connection with any pending or threatened action, proceeding, or investigation relating to the foregoing, including but not limited to the reasonable fees and disbursements of counsel for the Payee.  The Company indemnifies the Payee and its directors, managers, affiliates, partners, members, officers, employees and agents against, and agrees to hold the Payee and each such person and/or entity harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees and expenses, incurred by, or asserted against, the Payee or any such person and/or entity arising out of, in any way connected with, or as a result of (i) the consummation of the loan evidenced by this Convertible Note and the use of the proceeds thereof or (ii) any claim, litigation, investigation or proceedings relating to any of the foregoing, whether or not the Payee or any such person and/or entity is a party thereto other than any loss, claim, damage, liability or related expense incurred or asserted against the payee or any such person on account of the payee's or such person's gross negligence or willful misconduct.

11.    Amendment and Waiver.  The provisions of this Convertible Note may not be modified, amended or waived, and the Company may not take any action herein prohibited, or omit to perform any act herein required to be performed by it, without the written consent of the holders of a majority of the then outstanding principal amount of all Convertible Notes (including this Convertible Note); provided, however, that any amendment to this Convertible Note which (i) changes the Interest Rate in Section 1 hereof, or (ii) changes the Maturity Date in Section 2 hereof, must be approved in writing by the holders of 100% of the then outstanding principal amount of all such Convertible Notes (including this Convertible Note).

12.    Remedies Cumulative.  No remedy herein conferred upon the Payee is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

13.    Remedies Not Waived.  No course of dealing between the Company and the Payee or any delay on the part of the Payee in exercising any rights hereunder shall operate as a waiver of any right of the Payee.

14.    Assignments.  Subject to applicable law, the Payee may assign, participate, transfer or otherwise convey this Convertible Note and any of its rights or obligations hereunder or interest herein to any affiliate of Payee and to any other Person that the Company consents to (such consent not to be unreasonably withheld or delayed), and this Convertible Note

10



shall inure to the benefit of the Payee's successors and assigns. The Company shall not assign or delegate this Convertible Note or any of its liabilities or obligations hereunder.

15.    Headings. The headings of the sections and paragraphs of this Convertible Note are inserted for convenience only and do not constitute a part of this Convertible Note.

16.    Severability. If any provision of this Convertible Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Convertible Note will remain in full force and effect. Any provision of this Convertible Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

17.    Cancellation. After all principal, premiums (if any) and accrued interest at any time owed on this Convertible Note have been paid in full, or this Convertible Note has been converted this Convertible Note will be surrendered to the Company for cancellation and will not be reissued.

18.    Maximum Legal Rate. If at any time an interest rate applicable hereunder exceeds the maximum rate permitted by law, such rate shall be reduced to the maximum rate so permitted by law.

19.    Place of Payment and Notices. Subject to Section 4(a) above, payments of principal and interest are to be delivered to the Convertible Noteholder of this Convertible Note at the following address: 134 West 37th Street, 2nd Floor, New York, NY 10018, or at such other address as such Convertible Noteholder has specified by prior written notice to the Company. No notice shall be deemed to have been delivered until the first Business Day following actual receipt thereof at the foregoing address.

20.    WAIVER OF JURY TRIAL. THE PAYEE AND THE COMPANY EACH HEREBY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS CONVERTIBLE NOTE AND/OR THE TRANSACTIONS CONTEMPLATED HEREUNDER.

21.    Submission to Jurisdiction. Any legal action or proceeding with respect to this Convertible Note may be brought in the courts of the State of New York or of the United States of America sitting in New York County, and, by execution and delivery of this Convertible Note, the Company hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

(i)    The Company hereby irrevocably waives, in connection with any such action or proceeding, any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which they may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

11



(ii)    Nothing herein shall affect the right of the Payee to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

22.    <u>GOVERNING LAW</u>.  ALL ISSUES AND QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS CONVERTIBLE NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the parties have executed and the Company has delivered this Convertible Promissory Note on the date first written above.

COMPANY:

BIONUTRICS, INC.

By: _____
Name: Ronald Howard Lane
Title: President

12

**Exhibit B**

**Governing Dynamics Investment, LLC**
134 W 37th Street, 2nd Fl
New York, N.Y. 10018

September 12, 2007

**BY CERTIFIED AND**
**REGULAR MAIL**

Synovics Pharmaceuticals, Inc.
2575 E. Camelback Rd., Suite 450
Phoenix, Arizona 85016
Attention: Ronald H. Lane, Chief Executive Officer
             Steven Getraer, Chief Financial Officer

Gentlemen:

    This letter relates to that certain Convertible Promissory Note issued by Synovics Pharmaceuticals, Inc., (formerly known as Bionutrics, Inc.) to Governing Dynamics Investment, LLC ("Governing Dynamics") in connection of its $100,000 loan of February 16, 2006 (the "Note"). Various Events of Default as defined in Section 8 of the Note have occurred including, but not limited to, Synovics' failure to make payments when due under the Note.

    Pursuant to Section 8 of the Note, Governing Dynamics hereby declares all principal, accrued and unpaid interest and all other amounts payable under the Note immediately due and payable. This letter is being forward to our Counsel with instructions to initiate appropriate legal proceedings in the event the full amount payable under the Note is not paid promptly.

Very truly yours,

Alex Mashinsky
Manager

cc:  Eaton & Van Winkle LLP
     Joseph L. Cannella, Esq.